UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

| | |
|---|---|
| Amneal Pharmaceuticals LLC, County of Monmouth, Ohio Carpenters' Health Fund, MSP Recovery Claims, Series LLC, Joseph Brozozowski, Stelios Mantalis, Jacqueline Harris, Kristen Wineinger, Michael Hann, Marcia Brice, and Masao Hendrix,<br><br>　　　　　　　　　　Plaintiffs,<br><br>　　vs.<br><br>Caremark, LLC d/b/a CVS Caremark,<br>　　　　　　　　　　Defendant. | Civil Action No. |

**AMNEAL PHARMACEUTICALS LLC, COUNTY OF MONMOUTH, OHIO CARPENTERS' HEALTH FUND, MSP RECOVERY CLAIMS, SERIES LLC, JOSEPH BRZOZOWSKI, STELIOS MANTALIS, JACQUELINE HARRIS, KRISTEN WINEINGER, MICHAEL HANN, MARCIA BRICE, AND MASAO HENDRIX'S MOTION TO ENFORCE FOREIGN SUBPOENAS**

Amneal Pharmaceuticals LLC ("Amneal"), County of Monmouth, Ohio Carpenters' Health Fund ("Ohio Carpenters"), MSP Recovery Claims, Series LLC ("MSP"), Joseph Brzozowski, Stelios Mantalis, Jacqueline Harris, Kristen Wineinger, Michael Hann, Marcia Brice, and Masao Hendrix (collectively, "Movants") are parties in an ongoing putative class action in the United States District Court for the District of New Jersey, *In re Metformin Marketing and Sales Practice Litigation*, No. 2:20-cv-2324 (hereinafter, "*Metformin*").[1]  Both Amneal, a defendant in *Metformin*, and County of Monmouth, MSP, and Ohio Carpenters, *Metformin* third-party payor plaintiffs ("TPP Plaintiffs"), and Joseph Brzozowski, Stelios Mantalis, Jacqueline Harris, Kristen Wineinger, and Michael Hann, *Metformin* consumer plaintiffs ("Consumer Plaintiffs") issued

---

[1] Fact discovery in the *Metformin* litigation closes on July 15, 2025.  *See id.* at ECF No. 545.

subpoenas to Caremark, LLC ("Caremark"), a pharmacy benefit manager, as part of pretrial discovery in the *Metformin* litigation. Caremark has failed to comply with those subpoenas. Accordingly, pursuant to Rules 45(f) and 45(d)(2)(B)(i) of the Federal Rules of Civil Procedure, the Movants seek an order transferring the instant Motion to the District of New Jersey, or, alternatively, enter an order compelling Caremark to comply with the subpoenas and produce claims data necessary to the *Metformin* action withing 30 days.

## I.
## INTRODUCTION

County of Monmouth, MSP, and Ohio Carpenters, on behalf of themselves and a putative class of TPPs – including, for example, self-insured employers, unions, and health insurers – sued Amneal and other defendants, alleging that they and putative class members paid for adulterated, misbranded, and unapproved metformin-containing drugs ("MCDs") manufactured, distributed, or sold by defendants, and that they should get their money back because those MCDs were contaminated with n-Nitrosodimethylamine ("NDMA"). Knowing what TPP and consumer class members paid for those MCDs is necessary to resolving their claims – both for class certification and trial.

For this reason, Amneal and, separately, TPP Plaintiffs and Consumer Plaintiffs subpoenaed Caremark, a pharmacy benefit manager ("PBM") that administers prescription drug plans.[2] PBMs like Caremark are prescription drug industry middlemen. PBMs manage and administer prescription drug benefits on behalf of TPPs and other entities that provide prescription

---

[2] The parties also subpoenaed other PBMs seeking data and documents concerning MCDs. One prominent PBM has already produced the data sought from Caremark here. Negotiations with multiple PBMs are ongoing.

drug benefits.[3]  Among other things, PBMs like Caremark manage complex information exchanges and payments among patients, pharmacies, and TPPs.  When a patient fills a prescription using health insurance, "the pharmacy checks with a PBM to determine that person's coverage and copayment information.  After the [patient] leaves with his or her prescription, the PBM reimburses the pharmacy for the prescription, less the amount of the beneficiary's copayment.  The prescription-drug plan, in turn, reimburses the PBM." *Rutledge v. Pharma. Care Mgmt. Ass'n*, 592 U.S. 80, 84 (2020).  Caremark, the largest PBM in the nation,[4] "filled or managed 2.3 billion prescriptions on a 30-day equivalent basis" in 2023 and held a 34% market share by total equivalent prescription claims managed.[5]

      Caremark and other PBMs often engage in so-called "spread pricing arrangements" with their TPP clients.  *See We Offer PBM Clients a Variety of Pricing Options*, CVS Health (Aug. 15, 2018), https://www.cvshealth.com/news/pbm/we-offer-pbm-clients-a-variety-of-pricing-options.html.  Caremark offers spread pricing as an alternative to a pricing model in which Caremark's TPP clients pay separate administrative fees to compensate Caremark for its services.  In spread pricing arrangements, the amounts that Caremark pays pharmacies may be different from the amounts it charges TPPs.  Caremark describes its available pricing arrangements as follows:

---

[3] Not all of Caremark's clients are TPPs.  For example, Caremark's clients include third-party administrators ("TPAs") or administrative service organizations ("ASOs"), each of which contract directly with Caremark on behalf of TPPs. However, for readability, this brief refers to Caremark's clients as TPPs.

[4] Amneal and TPP Plaintiffs County of Monmouth, and Ohio Carpenters subpoenaed Express Scripts, Inc. and Optum, Inc. in addition to Caremark.  Together, these three PBMs have a nearly 80% share of the national market.  *The Top Pharmacy Benefit Managers of 2023: Market Share and Trends for the Biggest Companies*, Drug Channels (April 9, 2024), https://www.drugchannels.net/2024/04/the-top-pharmacy-benefit-managers-of.html.25).

[5] *See The Top Pharmacy Benefit Managers of 2023: Market Share and Trends for the Biggest Companies*, DRUG CHANNELS (April 9, 2024), https://www.drugchannels.net/2024/04/the-top-pharmacy-benefit-managers-of.html; CVS HEALTH 2023 ANNUAL REPORT FORM 10-K at 9.  In 2015, Caremark had a 24% market share, second only to Express Scripts.  Trefis Team, *Insurance Companies Start to Bring PBM In-house: CVS Health's PBM Business Could be Under Threat*, FORBES (July 28, 2015), https://www.forbes.com/sites/greatspeculations/2015/07/28/insurance-companies-start-to-bring-pbm-in-house-cvs-healths-pbm-business-could-be-under-threat/.

> In one model, clients agree to pay the price negotiated with the pharmacies, which can vary in accordance with the fluctuation of costs in the market, along with a separate administrative fee for the services we provide.  More often, we find that our clients choose a different model whereby they contract for predictable drug costs for the year and allow the PBM to keep the difference between this fixed amount and the amount paid to the pharmacy that dispenses the drugs.

*Id.*

Because PBMs act as "intermediaries between prescription-drug plans and the pharmacies who use them," the use of pharmacy claims data maintained by PBMs is commonplace in class action litigation where the amount TPPs paid for prescription drugs is at issue, and to determine class membership for class certification purposes.  *Rutledge*, 592 U.S. at 80; see*, e.g.*, *In re Niaspan Antitrust Litig.*, 67 F.4th 118, 123-27 (3d Cir. 2023), *In re Wellbutrin XL Antitrust Litig.*, 308 F.R.D. 131, 137-39 (E.D. Pa. 2015).  Here, the amounts that Caremark paid to pharmacies, and the amounts Caremark charged its TPP clients, are necessary to determine what TPP and Consumer class members paid for MCDs in *Metformin* and the extent to which those amounts differ from the amounts TPPs paid Caremark.  Accordingly, Movants requested claims data from Caremark, including data elements relating to the amounts Caremark paid to pharmacies as well as the amount Caremark billed to its clients.  *See* Exhibit A, Amneal's Subpoena to Caremark (Feb. 15, 2024), Request Nos. 2 & 4; Exhibit B, Metformin Plaintiffs' Subpoena to Caremark (Aug. 6, 2024), Request No. 1.

Caremark objected to Amneal's requests for this information with boilerplate language stating the requests were overly broad and unduly burdensome, and that the information was irrelevant and not proportional to the needs of the case.  Exhibit C, Caremark's Responses and Objections to Amneal's Subpoena (Oct. 18. 2024).  Caremark also objected to the extent that the requests seek "highly confidential, proprietary information or trade secret information . . . that is not shared outside of Caremark" or "documents, information, or data that Caremark is under

contractual agreement with other parties to keep confidential." *Id.* Caremark made the same objections to Plaintiffs' subpoena. Exhibit D, Caremark's Objections and Responses to Plaintiffs' Subpoena to Produce Documents (Aug. 23, 2024).

After numerous meet and confers, Caremark continues to refuse to produce data showing the amounts Caremark paid to pharmacies and the amounts Caremark billed to its clients (including elements of those amounts such as ingredient costs and dispensing fees). Caremark has provided no satisfactory justification for its refusal to produce this necessary data that cannot be obtained elsewhere. Data sufficient to show the amounts Caremark paid pharmacies will allow the parties to determine what TPP and Consumer Class Members paid. Without this data, the parties cannot determine the specific amount Caremark paid on behalf of TPP Class Members for the MCDs at issue. Data showing the amounts TPPs paid Caremark will allow the parties to determine the extent to which those amounts differ from the amounts Caremark paid pharmacies, and the extent to which TPP data alone can show the amounts TPPs paid for metformin.

Caremark has not substantiated its contention that producing this data would be unduly burdensome. The PBM industry is highly concentrated, and it is common in drug-related class action litigation for PBMs to provide the information necessary to ascertain potential TPP class members and determine the purchase price they paid. Caremark has not, and cannot, explain why producing the requested data about the amounts paid for metformin would increase its burden appreciably beyond the burden of pulling the data elements it has already agreed to produce. And while Caremark claims this information is highly confidential, it has not, and cannot, explain why the protection offered by the applicable protective order, which includes a special category for confidential PBM information, fails to protect its claimed confidentiality interests.

Given the District of New Jersey's familiarity with the *Metformin* litigation and its previous experience deciding disputes related to the scope of discovery in the case, Movants respectfully request that the Court transfer this motion to compel to the District of New Jersey for adjudication. Alternatively, Movants ask this Court to compel Caremark to comply with the subpoenas.

## II.
## ARGUMENT

**A.     The Court Should Transfer this Action to the District of New Jersey.**

This Court has broad discretion to transfer the instant motion to the New Jersey Court overseeing the *Metformin* litigation, and it should do so to promote efficiency and judicial economy. Fed. R. Civ. P. 45(a)(2) provides that subpoenas issue "from the court where the action is pending." Motions to compel nonparty production must be made in "the court for the district where compliance is required." Fed. R. Civ. P. 45(d)(2)(B)(i).[6] Under Fed. R. Civ. P. 45(f), however, the compliance court may transfer the motion to the court that issued the subpoena if "the person subject to the subpoena consents or if the court finds exceptional circumstances." The circumstances of this case permit transfer because the issuing court has adjudicated multiple disputes regarding the appropriate scope of discovery in the *Metformin* litigation, understands the relevance of PBM data, and as such can more efficiently and consistently assess the appropriate scope of Caremark discovery. *See In re Caesar's Ent. Operating Co., Inc.*, 558 B.R. 156, 158 (Bankr. W.D. Pa. 2016) (noting that "the need for efficiency, uniformity and orderliness to the discovery process" constitutes exceptional circumstances under Rule 45(f)). The Magistrate Judge assigned to the *Metformin* case has resolved multiple discovery disputes, and judicial economy

---

[6] Fed. R. Civ. P. 45(c)(2)(A) provides that the district in which compliance is required (the place of compliance) is "within 100 miles of where the person resides, is employed, or regularly transacts business in person." For a corporate entity, the appropriate place of compliance is within 100 miles of the entity's headquarters. In this case, this Court is the appropriate place of compliance as it is within 100 miles of Caremark's headquarters in Woonsocket, Rhode Island.

-6-

will be served by having all discovery disputes resolved promptly and consistently by the New Jersey court.

**B.     Alternatively, the Court Should Compel Compliance with Movants' Request for the Highly Relevant Claims Data Showing the Amounts Caremark Paid to Pharmacies.**

Parties may obtain discovery "regarding any nonprivileged matter that is relevant to any party's claims."  Fed. R. Civ. P. 26(b)(1); *see also Hasbro, Inc. v. Mikohn Gaming Corp.*, No. CV 05-106S, 2006 WL 8456751, at *1 (D.R.I. June 1, 2006) ("[A] party may obtain discovery regarding 'any matter, not privileged, that is relevant to the claim or defense or any party"); *Vesper Mar. Ltd. v. Lyman Morse Boatbuilding, Inc.*, No. 2:19-CV-00056-NT, 2020 WL 877808, at *1–2 (D. Me. Feb. 21, 2020) (collecting cases and holding that third-party subpoenas are "subject to the parameters established by Rule 26.").

A subpoena target resisting discovery bears the burden of showing that the subpoena imposes an undue burden, and it "cannot rely on a mere assertion that compliance would be burdensome and onerous without showing the manner and extent of the burden and the injurious consequences of insisting upon compliance." *In re New England Compounding Pharmacy, Inc. Prods. Liab. Litig.*, No. MDL 13-2419-FDS, 2013 WL 6058483, at *6 (D. Mass. Nov. 13, 2013) (collecting cases).  Given the significance of the data sought to the claims and defenses in *Metformin*, and Caremark's failure to explain the nature and extent of the any claimed burden, the Court should compel Caremark's compliance with Movants' subpoena requests for claims data showing the amounts Caremark paid to pharmacies as well as the amount Caremark billed to its clients (including elements of those amounts such as ingredient costs and dispensing fees).

    **1.     The Amounts Caremark Paid Pharmacies Are Needed to Show TPP Plaintiffs' Alleged Injuries and Damages.**

Here, parties on both sides of the *Metformin* litigation agree that the requested data, including data showing the amounts Caremark paid pharmacies for MCDs, are relevant to TPP

Class Members' injury and damages. These data show what TPP Class Members paid for the prescriptions at issue, and they are not available from another source because TPPs do not maintain records showing the specific amount the PBM paid to the pharmacy. Even if they did, TPP Plaintiffs here are just three TPPs that seek to represent an entire class of TPPs in this litigation – the requested transaction data would include all TPPs in the class that purchased through Caremark. Therefore, courts in similar circumstances have found that claims data maintained by Caremark, including data showing spread, are "directly relevant" to issues such as injury and damages. *See, e.g.*, *In re Generic Pharms. Pricing Antitrust Litig.*, No. 16-MD-2724, 2022 WL 4227550, at *1, *3 (E.D. Pa. Aug. 11, 2022), *report and recommendation adopted*, No. 16-MD-2724, 2022 WL 4227221 (E.D. Pa. Sept. 13, 2022).

Notably, it would not be enough for Caremark to produce data showing only what it charged its clients. The parties in the *Metformin* litigation need the amounts Caremark paid to pharmacies to determine the specific amounts TPP Class Members paid for the MCDs at issue, which is relevant to their alleged injury and damages. Amneal intends to argue as part of its defense that when TPPs pay spread to a PBM (i.e., pay the PBM a different amount than the PBM paid the pharmacy), which is common, they are paying for Caremark's administrative services, *not* for the drug supplied to a patient.[7] Therefore, Caremark data data showing what TPP Class Members paid their PBMs would be insufficient for Amneal. TPP Plaintiffs obviously dispute that such data would be insufficient.

Moreover, Amneal will argue that spread must be excluded from any calculation of injury and damages because TPPs would pay spread to Caremark regardless of whether their members

---

[7] Caremark, itself, publicizes that its clients "more often" elect spread pricing agreements rather than simply paying the price negotiated with the pharmacy and a separate administrative fee. *See We Offer PBM Clients a Variety of Pricing Options*, CVS Health (Aug. 15, 2018), https://www.cvshealth.com/news/pbm/we-offer-pbm-clients-a-variety-of-pricing-options.html.

filled prescriptions for defendants' allegedly contaminated MCDs or other diabetes drugs. *See, e.g. In re Valsartan, Losartan, and Irbesartan Products Liability Litigation*, D.N.J. No. 1:19-MD-2875, Letter Order, Oct. 3, 2024, ECF No. 2881 (holding, in a case with similar allegations and claims as those asserted in *Metformin*, that damages are assessed using a "benefit of the bargain" approach in which defendants are permitted to "introduce . . . evidence of other drugs that TPPs may have covered in the absence of the [at issue recalled product] to mitigate damages"). TPP and Consumer Plaintiffs obviously refute Amneal's purported arguments and defense based on spread pricing.

        **2.      The Amounts Caremark Paid Pharmacies and the Amounts Caremark Charged TPPs are Relevant to Class Certification.**

Data showing the amounts Caremark paid pharmacies and the amounts Caremark charged TPPs are relevant to determining whether Plaintiffs can demonstrate a class wide damages methodology. First, to satisfy Rule 23, plaintiffs must present a damages model that "measure[s] only those damages attributable to [the purported classes'] theory of liability." *See In re Thalomid and Revlimid Antitrust Litig.*, No. 14-6997, 2018 WL 6573118, at *15 (D.N.J. Oct. 30, 2018); (quoting *Franco v. Conn. Gen. Life Ins.*, 299 F.R.D. 417, 430 (D.N.J. 2014), *aff'd*, 647 F. App'x 76 (3d Cir. 2016)); *In re Skelaxin (metaxalone) Antitrust Litig.*, 299 F.R.D. 555, 575 (E.D. Tenn. 2014). As explained below, Amneal intends to argue that TPP data alone cannot perform this function, because a PBM's spread must be excluded from any damage calculation.

Second, to satisfy Rule 23(b)'s predominance requirement the moving party should address whether more than a de minimis number of uninjured plaintiffs exist. *In re Niaspan Antitrust Litig.*, 464 F. Supp. 3d 678, 715 (E.D. Pa. 2020) (citing *In re Asacol Antitrust Litig.*, 907 F.3d 42, 58 (1st Cir. 2018)). Amneal intends to argue that, where a substantial number of uninjured class members exist, individualized issues predominate and make class-wide adjudication unworkable.

*Id.* at 715-16, 720; *see also Asacol*, 907 F.3d at 53–54 (1st Cir. 2018) ("[In] a case where . . . there are apparently thousands who in fact suffered no injury[,] . . . [t]he need to identify those individuals will predominate and render an adjudication unmanageable"). Caremark's data is necessary to determine this common factual issue.

Here, Amneal intends to argue that publicly available data and data produced by another PBM show that because MCDs are relatively inexpensive generic drugs, in many cases PBMs like Caremark paid the pharmacy zero in MCD transactions, because the consumer's cost sharing payment (e.g., copayment or coinsurance) covered the entire amount due to the pharmacy. However, because of its spread pricing contracts with clients, Caremark often charges the payor anyway in those transactions. Amneal will state that in this "zero balance due" circumstance, the TPP client did not pay anything for the allegedly worthless MCD and thus the TPP sustains no alleged injury. Thus, Amneal believes that the requested data are needed to show the prevalence of payors uninjured by defendants' conduct. TPP Plaintiffs dispute Amneal's claim and believe that the price their paid and their data show that TPP Plaintiffs, Consumer Plaintiffs and their classes paid for the drugs and thus suffered injury. TPP Plaintiffs also intend to use the Caremark data to establish injury on a classwide basis.

    **3.**    **Collecting Data Showing the Amounts Paid Does Not Present a Significant Burden to Caremark.**

Caremark has not articulated a rationale for why producing the requested data would present any additional burden, let alone a burden so heavy that it would render compliance with the subpoena unreasonable. Despite numerous opportunities during the meet and confer process, Caremark has not explained "the manner and extent of the burden" or the "consequences of insisting upon compliance" as the First Circuit requires. *See In re New England Compounding Pharmacy, Inc. Prod. Liab. Litig.*, 2013 WL 6058483, at *6. The discovery sought is proportional

to the needs of the case, in which Plaintiffs claim millions of MCD prescriptions were contaminated and claim millions in damages. *Metformin*, 3d Am. Compl. ¶¶ 79, 131. Caremark already agreed to produce numerous other data fields showing details of pharmacy claims for MCDs, and there is no indication that producing the requested fields showing the amount paid to the pharmacy as well as the amount received from TPPs (including components such as ingredient cost and dispensing fees) will increase its burden.

### 4. Caremark's Confidentiality Concerns are Unfounded Given the Existing Protective Order.

Caremark's principal justification for refusing to provide the requested data is that it is sensitive and highly confidential. Movants acknowledge that the data sought contains sensitive business information – and this is why the applicable Discovery Protective Order of Confidentiality issued by the Metformin Court (which was sent to Caremark as an attachment to the February 15, 2024 subpoena) includes a special category for Restricted Confidential PBM Information. Exhibit E, Stipulated Discovery Protective Order of Confidentiality (March 29, 2022). This category explicitly includes "any pricing or cost related data." *Id.* Under the Protective Order, Restricted Confidential PBM Information can be used only for the purpose of the *Metformin* litigation and for no other action or purpose, and can be disclosed only to outside counsel, the court, mediators, trial witnesses (but only to the extent necessary), and experts or consultants (but only to the extent that it will be used exclusively in connection with the *Metformin* litigation). *Id.* Caremark has not explained, and cannot explain, why this protection is insufficient.[8]

---

[8] Although this Court may determine the issue, the interpretation of the Metformin Court's order may be more easily performed by that court, which is yet another justification for transferring the matter sub judice to the Metformin Court.

## III.
## CONCLUSION

For the foregoing reasons, Movants respectfully request that this motion be transferred to the District of New Jersey. Alternatively, Movants respectfully request that the motion be granted and this Court enter order compelling Caremark to comply with the subject foreign subpoenas within 30 days.

**LR Cv 7(c) Statement**

       The Movants respectfully requests oral argument and estimate that the argument will take 45 minutes.

Respectfully submitted,
The Movants,

| | |
|---|---|
| Amneal Pharmaceuticals LLC,<br>By its attorneys, | Plaintiffs and the Proposed Classes,<br>By their attorneys, |
| */s/ Judah H. Rome*<br>Judah H. Rome, Esq. (#9711)<br>**TROUTMAN PEPPER LOCKE**<br>2800 Financial Plaza<br>Providence, RI  02903<br>(401) 274-9200<br>judah.rome@troutman.com | */s/ Stephen M. Prignano*<br>Stephen M. Prignano, Esq. (#3649)<br>**MCINTYRE TATE LLP**<br>50 Park Row West, Suite 109<br>Providence, Rhode Island 02903<br>(401) 351-7700<br>(401) 351-7707 (Direct Dial)<br>(401) 331-6095 (Fax)<br>sprignano@mcintyretate.com |
| Melissa O'Donnell*<br>**TROUTMAN PEPPER LOCKE**<br>3000 Two Logan Square<br>Eighteenth and Arch Streets<br>Philadelphia, PA 19103<br>(215) 981-4110<br>melissa.odonnell@troutman.com | **CARELLA, BYRNE, CECCHI,<br>OLSTEIN, BRODY & AGNELLO, P.C.**<br>James E. Cecchi*<br>Donald Ecklund*<br>Kevin G. Cooper*<br>5 Becker Farm Road<br>Roseland, New Jersey 07068<br>Telephone: (973) 994-1700<br>Facsimile: (973) 994-1744<br>jcecchi@carellabyrne.com<br>decklund@carellabyrne.com<br>kcooper@carellabyrne.com<br><br>**KANNER & WHITELY, LLC**<br>Conlee Whiteley*<br>Allan Kanner*<br>David J. Stanoch*<br>Annemieke Tennis*<br>701 Camp Street<br>New Orleans, LA 70130 |

Phone: (504)-524-5777
a.kanner@kanner-law.com
c.whiteley@kanner-law.com
d.stanoch@kanner-law.com
a.tennis@kanner-law.com

**NIGH, GOLDENBERG, RASO & VAUGHN, PLLC**
Daniel Nigh*
Marlene J. Goldenberg*
14 Ridge Square NW, 3rd Floor
Washington, DC 20016
Telephone: (202) 792-7927
Facsimile: (202) 792-7927
dnigh@nighgoldenberg.com
mgoldenberg@nighgoldenberg.com

**BURSOR & FISHER, P.A.**
Scott A. Bursor*
701 Brickell Avenue, Suite 1420
Miami, FL 33131
Telephone: (305) 330-5512
Facsimile: (305) 679-9006
scott@bursor.com

**BURSOR & FISHER, P.A.**
Andrew J. Obergfell*
Max S. Roberts*
1330 Avenue of the Americas
32nd Floor
New York, NY 10019
Telephone: (646) 837-7150
Facsimile: (212) 989-9163
aobergfell@bursor.com
mroberts@bursor.com

**HONIK LLC**
Ruben Honik*
1515 Market Street, Ste. 1100
Philadelphia, PA 19102
Phone (267) 435-1300
rhonik@honiklaw.com

**MSP RECOVERY LAW FIRM**
Janpaul Portal*
2701 S. Le Jeune Road, 10th Floor

          Coral Gables, FL 33134
          Tel: 305-614-2222
          jportal@msprecoverylawfirm.com

**SCOTT+SCOTT ATTORNEYS AT LAW LLP**
Joseph P. Guglielmo*
Michelle Conston*
230 Park Avenue, 17th Floor
New York, New York 10169
Tel: (212) 223-6444
jguglielmo@scott-scott.com
dbroggi@scott-scott.com
ecomite@scott-scott.com
calexander@scott-scott.com
mconston@scott-scott.com

**LEVIN SEDRAN & BERMAN, LLP**
Charles E. Schaffer*
Frederick S. Longer *
Nicolas J. Elia*
510 Walnut Street – Suite 500
Philadelphia, PA 19106
Tel: (215) 592-1500
cshaffer@lfsblaw.com
flonger@lfsblaw.com
nelia@lfsblaw.com

*Counsel of record in the underlying litigation, *In re Metformin Marketing and Sales Practice Litigation*, No. 2:20-cv-2324, presently pending in the United States District Court for the District of New Jersey

**CERTIFICATE OF SERVICE**

I hereby certify that on April 1, 2025, this document, filed through the ECF system, will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).  This document has additionally been sent via email to Caremark's outside counsel involved in negotiating the at-issue subpoenas, Kate Letcher of Nixon Peabody LLP, and has been sent to Caremark's corporate headquarters via certified mail to the following address:

Caremark, LLC d/b/a CVS Caremark
1 CVS Drive
Woonsocket, Rhode Island 02895

                                                                         */s/ Judah H. Rome*